and we'll hear first from Mr. Brzezinski. Whenever you're ready, take your time. There are three key facts that apply across both the Privacy Act claim and the Administrative Procedure Act claim that I believe are key to the framework for the review of the legal issues here. First, it's undisputed that the VA employs over 400 full-time employees with an annual payroll of approximately $50 million exclusively to attempt to safeguard veterans' information within the VA system and to train all the other VA employees on the potential that could result from a breach of that personal information. Second, it is now a few months longer than 10 years since the loss of a laptop and a hard drive containing over 26.5 million records of veterans and then active duty personnel from VA facilities in Washington, D.C. And it's just a few months short of 10 years from when Congress and the President enacted specific statutory direction specifically aimed at only applying to the Department of Veterans Affairs to correct the gross problems that they found with the handling of veterans' personal information at that time. And third, not a single one of the over 150 VA medical centers has ever been found in compliance with the Privacy Act and the requirements there under, even though VA... Well, you know, that's a little misleading. I went back and looked at the testimony you recited in making that statement in your brief, and the man who testified to it says conditions change from day to day, and we can't be in compliance because of the changing circumstances. We have to adjust to every change that's made. But he did not suggest that they were deliberately or in any way failure of compliance with the statute at any given time. Your Honor, I respectfully disagree. Well, I know, but that's what I... I... Yeah, go ahead. He explicitly said they've never been in compliance. He explained the process, the arcane process of a one-to-five scale to one-to-five scales based on evidence of compliance. We're not talking about, and I'm not trying to mislead the Court on the issue of compliance with the Privacy Act. I'm sure on a day-to-day basis there are days, and there may not be days, there are hundreds of violations every day. There are individual violations by individuals. We're talking about VA internal formal reviews have never found, that's his statement in his deposition, and we've raised that below and it's never been challenged. They went from a number of 2.6 to a number around 4 after the litigation was sent, but they've never claimed to have been in compliance. Here, this is what he says, and he explains it. He says, well, I think it's important to recognize that when you're talking about privacy and security, and I can't really speak to that with any kind of authority, but for privacy particularly, it is an ongoing moving target. We could be compliant today and non-compliant tomorrow. All it takes is the wrongful action of somebody to make us non-compliant, whether it's somebody from the outside of the organization or maybe perhaps somebody from the inside. My only point is you made it sound as if they had just been non-compliant forever. They say we're always non-compliant because it's a moving target from day-to-day. That was his explanation for making that statement. I don't disagree, Your Honor. That's his explanation. The point being that, again, 10 years after they lost the laptop and there have been intervening laptop losses, this laptop disappears. It has the same conditions as 10 years ago and probably before that. It's not locked down. It doesn't have password protection. It's not encrypted. It's not in a locked room, and even if it was in a locked room, all the keys to the room are master keys of which they've lost control of, and they know at least five ex-employees still have keys to it. Three years after they left the building and they haven't re-kept the keys. Let me ask you this. We don't know anything about where the computer went or how it was used, according to this record, if I'm correct. I'm sitting here thinking, here's a computer lying unprotected in a room, and some low-level employee comes in and steals the computer and says, Does that violate? Yes, it would, under their own definition of a data breach. There was no data breach. He didn't publish it or disclose it to anybody. Your Honor. The employee who's an inside, and that's the suggestion that it was some inside person, took it home, deleted all the data in order to have the computer, and used the computer as a personal computer. Two points, Your Honor. First of all, that is the definition. It's federal regulation. We need the site that defines a data breach. VA defines a data breach as the loss or theft of data, personal information, such that it can be either used or compromised, potentially is in there. So it is a data breach. As a matter of fact, the Secretary declared it a data breach. What regulation are you citing? And does that regulation, under the facts that Judge Niemeyer has posited, give your client a right to sue? Your Honor, I will get you the citation to that. 38 CFR 75.112, data breach. And I'll give you a better definition. Okay. So I'll take the word that that's fine there. So how does that amount to a cause of action for your clients, under the facts that Judge Niemeyer has posited? Under the facts, if those were the facts, it's still a data breach, and it is still defined as a loss and compromise, a reasonable risk of compromise or use of the data. But your point goes to more the issue of damages, of actual damages. And that's where we believe the district court also erred. And if you'll allow me to add my second point, I will come back to that issue. The second point, Your Honor, is that this was a six- or seven-year-old laptop known to be in the medical lab. I would posit respectfully back that anybody who knew that that computer existed inside of that lab, inside of a supposedly secure floor, inside a VA medical center, inside a security fence, knew what was on it. So I believe it's a factual issue of why it was there. Except the record allows for the possibility that an inside employee who wanted the laptop, it was lying there, nobody was watching it, it wasn't tethered, it wasn't locked up, walks off with it to have a personal computer. Now the question I have is why does that violate the statute? It's violating statute because that's by definition, again, the statute that applies to VA for safeguards purposes. What is the statute section? Your Honor, I'm looking at the regulation that the secretary uses. 38 CFR 75116 is what I have with me. Upon receipt of a risk analysis, the secretary will consider the findings contained in the risk analysis to determine whether the data breach caused a reasonable risk or potential misuse of sensitive personal information. If the secretary finds that such a reasonable risk does not exist, the secretary will take no further action. However, if the secretary finds that a reasonable risk exists, the secretary will take responsive action as specified in the subpart. And that gets into the credit monitoring. He made this determination. He authorized expending federal funds because he determined there was a reasonable risk of compromise. We do not know. It's a factual issue. What happened? The other side says it's a missing issue. There's no fact to posit what happened. In other words, we're lacking in facts to know whether there was a data breach or there was a disclosure of data or there was an intent to use the data. My question is whether a piece of hardware, how about a thumb drive that's stolen, and this thumb drive was empty. It had not been used. It was sitting there on the desk, and it was going to be used to transfer some data from one computer to another. But it had not been filled. Somebody steals the thumb drive. That's a potential risk, too, to steal that thumb drive. It could have had data on it, and the data could have been stolen to give to somebody else. And that's exactly why. But my point is that it seems a little absurd, unless we have a closer connection with the fact that data was misused or breached or intended to be misused or breached. Your Honor, it is exactly why the Secretary is required by law to make this determination. If the determination is there's nothing on that drive or on that disk, it's not a data breach. They won't know. Well, they might know, but the fact is it was stolen. And I'm just creating a hypothetical where it's the hardware that's the focus of the theft, not the data. Yes, Your Honor. In this case, we don't know whether it's a – if we had a hacker, that's one thing. But we're just talking about the theft of a computer that should have been locked up and wasn't. And should not have had unencrypted information on it to protect against exactly the scenario you're saying, Your Honor. And also, again, I will reiterate, the street value of this computer was – It's not a question of street value. That's so speculative. I mean, somebody coming through doesn't sit there and say, is this a 1999 or a 2007 model. He sees an opportunity. There is a laptop sitting there. He doesn't have one at home, so he steals it. That's a possibility. And I, again, respectfully submit to risk federal penitentiary for a 7-year-old laptop is at best an equivalent deterrent to what you're saying. To take a laptop out of a lab. This isn't a place where people walk by and saw it. I'll bet you a 7-year-old laptop, if it was a good one, still has pretty current usage. Well, again, Your Honor, respectfully, that's the kind of supposition. Well, yours was a supposition that somebody would evaluate whether it's 7 years or 3 years or whatever and not steal it because it was 7 years. I'm suggesting a thief who sees the opportunity is not trying to assess what age the computer is. Probably doesn't even know. Which gets exactly to our point on the legal issue here. That the VA has had decades to prevent this kind of walk by, I need a computer, even if that's true. The point is their data on that was compromised. But isn't the question here whether the district court erred? Yes, Your Honor. Okay, so we're talking about lacking Article 3 standing. Senator? Yes, Your Honor. We believe, to get to the point on the Privacy Act claim, the district court erred in tying pecuniary actual damages to the question of standing. If you look at the Chao case, the Supreme Court Chao case, it specifically says that the standing issue turns on adverse effect. Right. So what is the adverse effect? You're saying because you know their names were on the computer, that's adverse enough? We believe and submit that the Privacy Act, Section E10, lists the types of adverse effects and it explicitly says safeguards are here to prevent these types of issues. Embarrassment, extra work, you know, worry and effort to correct or prevent further harm. It says that explicitly in 552AE10. And that's what we have alleged. It's in the record. We allege it in our amended complaint. We discussed it and I discussed it with the district court judge during our hearing at 999 through 1002. And if you look, what's interesting about the term adverse effect is also in the Administrative Procedure Act. That's the basis for that. What happens if the agency didn't lock up the computer and didn't do any of the safeguards? That happened in this case. But the laptop was never stolen. And your client comes in and says, aha, I caught you. The laptop is not protected. You didn't take the safeguards. Potentially there could have been a terrible breach. I want damages. Your Honor, damages under the Privacy Act. Is that a cause of action under your theory? You would not have a cause of action for damages because he wasn't damaged. He would still have the same APA claim to enforce action that is properly withheld. In this case, we're not talking about large programming changes. We don't want any changes. We just want them to do exactly what they said they would do. Let me ask you, set aside the APA. That's got some other issues to it. Does he have a cause of action, privacy cause of action for failure to secure the data? Yes, Your Honor. And I will explain. So the computer is sitting there in the room just as it was, but it was never taken. But it was not protected. And you're saying because there was a potential risk of harm to him, he could sue. No, Your Honor. If there was adverse effects from that, he can sue. What's the adverse effects? In your scenario, there are likely not. So he would not have the claim. That is not our case. What's the adverse effects in this case? The adverse effects in this case are, one, Miss Gadgetar has reported, and it's in the record, three attempts on her credit shortly thereafter. Those were unrelated. They were not only unrelated, they used financial data. Your Honor. That is an overstatement. Set aside that for a moment. Is there any other adverse effects? The same statements that she checked her credit. She's the one who discovered those things, Miss Gadgetar. Mr. Wilhite and others have testified, too. They're worried about this. The data on those computers would not have led to those violations of her credit. Your Honor, I disagree. First of all, it was all reconstructed, what was on there. No one could actually say who or what was on there. There's names, addresses, and partial Social Security numbers. We've got experts that say that alone can be tied to other information. To say that those weren't related is respectfully at least equal supposition to say they are related, and that's an issue of fact. The point here is that the Privacy Act in the damages section has two components. Let me just go back to my question. Other than that incident, was there any adverse effect in this case? Yes. By the definition of adverse effect in the Privacy Act, Section E10, there was embarrassment, there was exposure, and additional effort that they had to undertake to respond to the notices that they got to check to see, and in some cases they couldn't afford the credit monitoring. Don't the cases suggest, though, that you can't generate a cause of action by taking affirmative action to protect yourself in these circumstances? If it's unreasonable, sir. That's exactly what we're saying, that the Secretary's determination that there was reasonable risk ties in with Gas and Copper's reasonable fear and concern. In the Privacy Act case, if I can go back to damages, the section that allows pecuniary damages, it's liability for actual damages and attorney fees and reasonable costs. And the point here that if we can open the door, which we are allowed to under adverse effects, then we can pursue the liability issue, which has two components. Why don't you raise this one on your rebuttal? Because we've been gone through the red light for a while. Ms. McNeil. Good morning. May it please the Court, Sonia McNeil for the government. I'd like to start with the Privacy Act and the laptop incident. It's undisputed here that the plaintiffs don't have a cause of action because they haven't shown that they've sustained any actual damages. As the Supreme Court explained in Doe v. Chau and FAA v. Cooper, actual damages means monetary harm. And each one of the plaintiffs in this case has testified that he or she has not sustained any monetary harm as a result of the incident. Is your position that you need Article III standing in addition to the adverse effect, which we just heard all about? Absolutely, Your Honor. And I'd like to take this opportunity to correct what I believe is a misunderstanding of E10. There's nothing in E10 that says that embarrassment amounts to an adverse effect sufficient to confer Article III standing. E10 describes the scope of the agency's obligation to protect records, but it doesn't purport to define adverse effects, and it certainly doesn't say that mere embarrassment would be enough to confer standing. I think plaintiff's counsel put it best when he said, we just don't know what happened here. In the words of the Riley Court, to arrive at a conclusion that the plaintiffs are at risk of certainly impending identity theft requires us to begin with if. If, as you say, Judge Niemeyer, the information on the laptop was actually accessed. If there was evidence to show that the person who has the laptop, if indeed anyone has it now, intends to commit identity theft. If the information on the laptop would even be sufficient to allow them to do so. That chain of hypotheticals is simply too long and too speculative to confer standing. What about the incidents that Mr. Rosensky described with respect to the purchases at the retail store? Well, as you explained, Judge Niemeyer, it's simply speculative, and I think plaintiff's colloquy acknowledged as much that those purchases have any connection to the information that was on the laptop. Those purchases were made using the existing financial account of Ms. Gahadar, I believe is how you pronounce her name. But the information that was on the laptop was only a name and the last four digits of the Social Security number. As plaintiff's own experts testified, and this begins at JA 234, it would be extremely difficult, if even possible, to use a name and the last four digits of a Social Security number to commit what's called existing account fraud, which is what Mrs. Gahadar discusses. Plaintiff's expert explains that first you would have to get some more information. It wouldn't be enough merely to use the information on the laptop to commit fraud using an existing account. Then the thief would have to guess about where the plaintiff might have an account, calling around randomly to financial institutions to see if he or she could fool a customer service representative into giving information about the account. Then the plaintiff's expert explains the person would have to persuade the financial institution to change the address to which account statements were sent. I mean, I won't go on, but in any event, the causal link between the alleged project... Those incidents involved an actual account that she had with retail stores, existing accounts? Yes. And somebody compromised those accounts? Yes, that's the allegation. Yes, that's right, Your Honor. I'd be happy to answer any further questions that the court has. Thank you. We ask that the judgments below be affirmed. Mr. Brzezinski, anything further? Yes, Your Honor. In regard to your question of which statute, 38 U.S.C. 5722 and 5723, I'm going to point out the problem with the issue on what happens here. This is what's happened for 20 years or 40 years or 10 years. Something happens and nothing gets done to fix it, and then we end up arguing about causation when something occurs. We had exactly what we said was going to happen, and indeed, if you follow the government's argument, there's only three of the five people named plaintiffs had their names on the computer, if you believe that. Let's believe it. One of them has reported suspicious activity. That's one out of three. That's 33%. That is exactly the number that their experts were training their people on, that 33% of the veterans whose information was released would have suspicious activity or suffer other harms. That's a coincidence. That's a coincidence. But what I hear being said here is that unless we can prove that something in a computer, in a bank somewhere sometime in the future is directly caused by these violations, and there's no doubt they're violations, we're not blanketing. We're saying that wasn't locked. Judge, just what you said on all the occurrences should never happen. When is the government going to be held accountable for fundamental, fundamental compliance? Not tic-tac every day. We're up to basic compliance. Ten years after statute said they have to do it. They've argued in the papers and below that all they have to do is put enough books on the shelf. Nothing in the Privacy Act requires them to implement. That's their position below. That is exactly the problem we have, which was noted by the judge in the very first district court judgment in Chow, which ended up discussing many of the issues we're talking about today, is that the government's position is that essentially the court cannot stop the VA from violating the rights that were granted in the Privacy Act. It's not here a little bit different. It's not whether you can enforce, tell the VA to do its job, but rather whether your clients were injured by a cause of action created by the VA's lack of doing a job. In other words, there's a distinction, because we have to look at a particular incident to see how it affected your clients, as opposed to monitoring the VA and telling them. I mean, it would be impossible for a court to look over the agency and tell them everything they should be doing under the statutes that Congress created. Yes, Your Honor, and we don't ask for that. We don't want the court to do anything, but what we're asking for is the ability to see these reports that say they're up or down. For example, one of the issues that still is unresolved below and may or may not ever be addressed is that they say they've trained and they've done background checks on everybody who has access to personal information, which is a requirement. But at the same time, they never knew where the information was. They didn't know this computer existed or had personal information until it was stolen. How can you claim to have met the requirement when you don't even know who's in it? But how is that relevant to your client's claim for damages? The client's claim for damages in the Privacy Act, G1D, as reported by this court in Chow, is two parts. If we do not, cannot show pecuniary damages, we are still able to obtain costs and fees as part of a liability. You need to make a liability determination of which or each of those two points. It is not enough to say there's no pecuniary damages, therefore you have no standings. Well, this is the case of that attorney, please. No, Your Honor, that's the way the Supreme Court had parsed it, that you get in the door, and what I'm saying is Chow gave one explanation for getting in the door, and this court explained it as a liability determination, and hopefully a government agency that is found liable for not performing requirements under the Privacy Act or the APA would take action to do that. The example of what we're asking for, I explained. If they have nonsensical reports, that's what's been going on. Under the APA, all of our clients, including the two that may not have been on the computer, have a right to have their information protected. There's no argument that they're protecting it. They have admitted or not. You tell us that they haven't complied for 40 years, and you're asking for an injunction to tell them to comply. You want us to go up and down the statutes and up and down the regulations and have an investigation to figure out what they're doing wrong and issue an injunction that they have to fix it? No, Your Honor. What we're asking for is that the court, the district court, ask the VA what are they going to do to fix it, when do they think they'll have it fixed, and then remain jurisdiction. Are we going to have a court dialogue with the agency? They do reports daily, weekly, monthly, quarterly to assess compliance. You can assess their own schedule. That's been done. That's been done in Cobell and others, and that's the problem. Nobody is enforcing or holding the agency, and there's no evidence under Lyons. For example, it's the reverse of Lyons. There's never been a compliance, at least the way we view it and the way that we understand it, that they can say, well, we'll know they'll be in compliance tomorrow. I think we've got it, and we'll let you're in court for the day and then come down and brief counsel.
judges: Paul V. Niemeyer, Albert Diaz, Irene M. Keeley